UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,                          Case No. 6:26-cv-

v.

Approximately 1,447,284.30 USDT previously
associated with the following unhosted virtual
currency address on the Tron blockchain:
TNnuQUJEAv4tooeNKp2fE8yjeb9VqMBhYu,

     Defendant.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America brings this complaint and alleges upon

information and belief, in accordance with Rule G(2) of the Supplemental Rules for

Admiralty or Maritime Claims and Asset Forfeiture Actions, as follows:

## NATURE OF THE ACTION

1.     This is a civil action *in rem* to forfeit to the United States, pursuant to 18

U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(1)(A), approximately 1,447,284.30

USDT (the Defendant Funds) previously associated with the following unhosted

virtual address on the Tron blockchain:

TNnuQUJEAv4tooeNKp2fE8yjeb9VqMBhYu (the Subject Address).

2.     The United States took custody of the Defendant Funds on or about

July 3, 2026, pursuant to a Federal seizure warrant, after a finding of probable cause

that the funds constituted proceeds of wire fraud offenses, in violation of 18 U.S.C.

§§ 1343 and 1349, and property involved in money laundering offenses, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Thus, Defendant Funds are subject to civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

3.    The Defendant Funds are currently in the custody of the United States Secret Service.

## VENUE AND JURISDICTION

4.    Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395(b), because pertinent acts giving rise to the forfeiture action occurred in the Middle District of Florida.

5.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

6.    This Court has *in rem* jurisdiction over the Defendant Funds because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida. 28 U.S.C. § 1355(b)(1)(A).

7.    Because the Defendant Funds are in the government's possession, custody, and control, the United States requests that this Court issue an arrest warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule G(3)(b)(i). Rule G(3)(b)(i) requires the Clerk to issue a warrant of arrest *in rem* for defendant property if such property is in the government's possession, custody, or control.

8.     After the Court issues the warrant of arrest *in rem*, the United States will execute the warrant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## STATUTORY BASIS FOR FORFEITURE

9.     The Defendant Funds represents proceeds of violations of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud) and are, therefore, subject to civil forfeiture by the United States, pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses. 18 U.S.C. § 981(a)(1)(C). Section 1956(c)(7)(A) incorporates the racketeering offenses under 18 U.S.C. § 1961. Wire fraud offenses in violation of 18 U.S.C. § 1343 are specified unlawful activities under 18 U.S.C. § 1961(1).

10.     Additionally, the Defendant Funds constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956, or are traceable to such property and are, therefore, subject to civil forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(A). Section 981(a)(1)(A) provides for the civil forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, or any property traceable to such property.

## FACTS

11.     Specific facts supporting the forfeiture of the Defendant Funds have been provided by Thomas Johnson III, a Task Force Officer with the United States Secret Service (USSS), who states as follows.

12.     Based on TFO Johnson's investigation, it appears that the Subject Address was used to receive and launder funds traceable to multiple victims who were deceived by unknown individuals impersonating law enforcement officials into sending funds in order to avoid arrest. Instead, the funds were moved through multiple layers of addresses, without the victims' authorization, and transferred, at least in part, into the Subject Address.

**A.     Background Related to Law Enforcement Impersonation Scams**

13.     Over the past few years, individuals and businesses, domestically and internationally, have seen a drastic increase in victimization associated with fraud schemes that are commonly referred to as a Law Enforcement Officer (LEO) Impersonation Scams. The USSS has been actively investigating these schemes with attempts to identify those responsible and to recover any fraudulently obtained funds.

14.     A LEO Impersonation Scam is a scheme involving individuals impersonating officers and agents of law enforcement agencies like the Federal Bureau of Investigation (FBI), the Internal Revenue Service (IRS), United States Marshals Services (USMS), or local police departments or sheriff's offices, often using fake credentials or spoofing phone numbers to appear legitimate. The suspects then employ urgent threats to instill fear and deceive victims into believing they have

a warrant for their arrest or are suspected of being linked to organized crime. The sole purpose is to convince the victim to wire money to a subject-controlled bank account or, in some cases, send funds to a cryptocurrency address.

**B.   Background on Cryptocurrency**

15.   Virtual currency, or digital currency, is currency that exists only in digital form. Cryptocurrencies are a type of virtual currency that can act as a decentralized, peer-to-peer, network-based medium of value or exchange. Cryptocurrencies may be used as a substitute for fiat currency[1] to buy goods or services or may be exchanged for fiat currency or other cryptocurrencies. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Cryptocurrency can be exchanged directly from person to person, through a cryptocurrency exchange, or through other intermediaries. A cryptocurrency exchange is a business that allows customers to trade cryptocurrencies for other cryptocurrencies or other forms of value, such as traditional fiat currencies. Exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information about their customers and verify their clients' identities.

16.   Generally, cryptocurrency is not issued by any government, bank or company; it is instead generated and controlled through computer software operating

---

[1] Fiat currency is a type of currency that is issued by the government and not backed by physical commodities, such as gold. The U.S. dollar, the euro, and the pound are examples of fiat currencies.

on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Investigators can trace the flow of cryptocurrency funds, in part, by analyzing these publicly available blockchain entries.

17.     Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. One wallet can contain multiple cryptocurrency addresses, each which can be used to transfer or receive cryptocurrency.

18.     To conduct transactions on a blockchain, an individual must use the public address, (or "public key") and the private address (or "private key"). A public key is akin to a bank account number, and a private key is akin to a Personal Identification Number (PIN) or password that allows a user the ability to access and transfer value associated with the public key. Each public key is controlled and/or accessed through the use of the unique corresponding private key needed to access the address. Only the holder of an address's private key can authorize any transfer of cryptocurrency from that address. To complete a transaction, a sender needs only the public address of the receiving party and the sender's own private key. Once the sender's transaction announcement is verified by the network, the transaction is added to the blockchain.

19. It is virtually impossible to look at a sole transaction on a blockchain and immediately determine the identity of the individual who conducted that transaction because blockchain data generally consists of only alphanumeric strings and timestamps. That said, law enforcement can obtain leads regarding the identity of the owner of an address by analyzing blockchain data to figure out whether that same individual is connected to other relevant addresses on the blockchain. To do so, law enforcement can use blockchain explorers, as well as commercial services offered by several different blockchain-analysis companies. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (i.e., a 'cluster'). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020). Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

20. Cryptocurrencies have many known legitimate uses. However, much like cash, cryptocurrencies can be used to facilitate illicit transactions and to launder criminal proceeds, particularly given the ease with which these assets can be moved with high levels of anonymity.

21.     Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

22.     One example of a stablecoin is USDT, which is pegged to the U.S. dollar. USDT is an alternative type of cryptocurrency or altcoin token. Payments or transfers of value made with USDT are recorded in the blockchain network, but unlike decentralized cryptocurrencies like bitcoin, USDT has some anatomical features of centralization. One centralized feature is that USDT is a Stablecoin or a fiat- collateralized token that is backed by fiat currencies, or currencies issued by governments like the dollar and euro. USDT is backed with a matching one to one fiat amount, making it much less volatile than its counterpart, Bitcoin. Due to USDT's stable nature, wallet holders typically use a fundamental strategy to hedge their cryptocurrency holdings into USDT to hedge their receipt or earnings value, so it is not affected by the rest of volatile cryptocurrency market. Issuance and circulation of USDT tokens are controlled by the entity known as Tether International S.A. de C.V. Tether is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

23.     Although the identity of a USDT address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often be used to identify the owner of a particular

USDT address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.

24.     USDT is hosted on the Ethereum and Tron blockchains, among others. Ethereum (ETH) and Tron (TRX) are cryptocurrencies that are open source, public, have a blockchain, and are distributed on platforms that use "smart contract" technology.

25.     Smart contracts allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided without any type of middleman or counterparty controlling a desired or politically motivated outcome, all while using the Ethereum and Tron blockchain protocols to maintain transparency. Smart contract technology is one of Ethereum's and Tron's distinguishing characteristics and an important tool for companies or individuals executing trades on the Ethereum and Tron blockchains. When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code. A transaction contemplated by a smart contract occurs on the Ethereum and Tron blockchains and is both trackable and irreversible.

26.     Customers use smart contracts on the Ethereum and Tron blockchains to trade one form of digital currency for another, such as exchanging ETH for USDT, or to exchange volatile forms of digital currency into stable forms of digital currency or stablecoins. In my training, certification, and experience, cyber criminals conducing scams or other forms of cyber enabled crimes frequently use smart

contracts on the Ethereum and Tron blockchains to launder or obfuscate their illicit gains.

27.     A bridge refers to a technology that allows the transfer of cryptocurrency assets between different blockchain networks, essentially acting as a connection point to move tokens from one chain to another, enabling interoperability between various blockchain ecosystems.

**C.     Overview of MDFL Investigation into the Subject Address**

28.     This investigation was initiated from a fraud report received by the USSS from Victim 1, a resident of Lake Mary, Florida, within the Middle District of Florida, who was the victim of a LEO Impersonation Scam resulting in a loss of approximately $420,000. As detailed below, TFO Johnson's investigation revealed that Victim 1 wired funds in interstate commerce from Victim 1's Bank United personal checking account in Lake Mary, Florida, which were then moved through multiple intermediary cryptocurrency addresses, converted from ETH to USDT, and bridged from the Ethereum to Tron blockchain before they were ultimately transferred to the Subject Address, all without Victim 1's authorization.

29.     While performing blockchain analysis to trace Victim 1's funds, TFO Johnson identified two other victims of similar LEO Impersonation Scams whose funds travelled a similar pattern as Victim 1: the funds were moved through at least one of the same intermediary accounts as Victim 1's funds, converted from ETH to USDT, and bridged from the Ethereum to Tron blockchain before their deposit, in part, into the Subject Address.

30.     This type of movement of the victims' funds through multiple intermediary addresses, often in quick succession, and the use of smart contracts and bridging services to convert the cryptocurrency and hop from one blockchain to another, served no legitimate purpose other than to conceal and disguise the nature, location, source, control, or ownership of the criminal proceeds.  Therefore, funds held in the Subject Address, including the Defendant Funds sought for forfeiture herein, constitute proceeds of fraud and property involved in concealment money laundering.

### *Victim 1 – LEO Impersonation Scam*

31.     On February 19, 2025, the USSS Orlando Field Office was contacted by Victim 1. According to Victim 1, on January 20, 2025, Victim 1 received a phone call from unknown individuals purporting to be with the United States Postal Inspection Service (USPIS), the FBI, and the Department of Justice (DOJ) (collectively the LEO impersonators). Victim 1 was led to believe he was communicating with legitimate representatives from the USPIS, the FBI, and the DOJ. Instead, these LEO impersonators fraudulently convinced Victim 1 that Victim 1 was being investigated for a connection to organized crime and international money laundering.

32.     The LEO impersonators continued contacting Victim 1 over the following weeks via phone calls and text messages. On February 6, 2025, the LEO impersonators presented Victim 1 with a fictitious federal arrest warrant on FBI and DOJ letterhead with Victim 1's name and social security number on it, which led

11

Victim 1 to believe they were indeed under criminal investigation. The LEO impersonators stressed to Victim 1 if they did not comply and provide a detailed list of their financial assets for a "forensic analysis," all of Victim 1's financial assets would be frozen and seized by the federal government, and Victim 1 would be arrested.

33.    In response, Victim 1 provided a detailed list of their financial assets, including information on thirteen personal or business checking and savings accounts, including account balances. Upon receiving Victim 1's detailed list of financial assets, LEO impersonators told Victim 1 that their Bank United personal checking account ending in 0290 (Bank United 0290) was the account connected to organized crime and international money laundering. Bank United 0290 had the second largest balance out of the thirteen accounts identified on Victim 1's list of financial assets, with a balance of approximately $425,663.09. The largest account was a business account, which had other account holders listed on it.

34.    On February 12, 2025, LEO impersonators told Victim 1 that the funds in Bank United 0290 were needed for further "forensic analysis" in order to determine whether Victim 1 was truly linked to organized crime and international money laundering. LEO impersonators coached Victim 1 on how to create a Coinbase account as part of the process in which Victim 1 would send the funds needed for the "forensic analysis" to the LEO impersonators. Under the guidance of the LEO impersonators, Victim 1 created Coinbase account number 67a697221acc5013185f8d9c (Coinbase account 8d9c).

35.     Victim 1, believing the LEO impersonators to be legitimate law enforcement officials, transferred $420,000 from Bank United 0290 to newly created Coinbase account 8d9c.

36.     On February 13, 2025, after Victim 1 deposited the $420,000 into the Coinbase account, LEO impersonators directed Victim 1 to convert the $420,000 to ETH. Victim 1 did as directed and was left with 154.4769 ETH.[2] Victim 1 was then told by LEO impersonators to send the ETH to wallet address 0xe9390A6aEfa913A8f5759CD63A836b5164dB0F0f (0xe939).

37.     Based on the representations of LEO impersonators, Victim 1 believed their funds would be "forensically analyzed" and returned to them after it was determined Victim 1 had no connection to an organized crime and international money laundering investigation.

38.     On February 19, 2025, Victim 1 contacted the Seminole County Sheriff's Office to ascertain the status of the "forensic analysis" of the funds they had sent to the LEO impersonators. To Victim 1's surprise, Seminole County Sheriff's Office officials informed Victim 1 that they were not a suspect in an organized crime and international money laundering investigation, nor was there a federal warrant for Victim 1's arrest. Victim 1 then realized they had been scammed.

### *Tracing of Victim 1's Funds to Subject Address (Exhibit A)*

39.     Victim 1's funds were traced using third party cryptocurrency and

---

[2] At the time, 154.4769 ETH had a value of approximately $408,261. Approximately $11,739 in fees were paid to convert the funds to cryptocurrency.

blockchain tracing analytical software. These findings were verified against open source blockchain explorers resulting in the same findings. As will be detailed below, from February 13, 2025, to February 14, 2025, Victim 1's 154.4769 ETH was moved through multiple addresses on the Ethereum and Tron blockchains, converted to USDT, and transferred to the Subject Address.[3] A diagram illustrating the movement of Victim 1's funds through the blockchain and into the Subject Address is attached as Exhibit A.

40.     As noted above, on February 13, 2025, Victim 1 transferred 154.3280 ETH from their Coinbase account to 0xe939. Prior to this deposit, 0xe939 was empty and had not conducted any transactions.

41.     Less than two hours later, 0xe939 transferred the 154.3279 ETH to 0x5184113c7d280f423d461ca1b585ce08dd12ada2 (0x5184). Prior to receiving the 154.3279 ETH, 0x5184 contained 426.2529 ETH which, as will be detailed below, are entirely traceable to an additional victim - Victim 2. No additional ETH transactions occurred in 0x5184 until the following day, on February 14, 2025, when

---

[3] Unless otherwise stated, throughout the tracing analysis in this complaint, each address receiving funds traceable to the identified victims did not receive any other funds between the time the address received the victims' funds and the time when those funds were withdrawn or moved on to the next address.  Based on the Last-In-First-Account (LIFO) accounting concept, this means that each transfer from one address to the next was comprised of the victim's funds. LIFO is an approach used to calculate which funds are subject to forfeiture in an account containing both tainted and non-tainted funds. The LIFO concept posits that withdrawals from the account are first funded by the deposit that immediately preceded it. In the event there are insufficient funds to fund that withdrawal, the next preceding deposit is drawn from.

0x5184 transferred 154.3277 ETH (entirely traceable to Victim 1) to

0x3963c62fa58b977a150001978f43c3d51ac17971 (0x3963).

42.    Prior to receiving Victim 1's 154.3277 ETH, 0x3963 was empty and had not previously conducted any transactions. Within four minutes of receipt of Victim 1's funds, 0x3963 transferred 153 ETH in six transactions to Uniswap, a cryptocurrency swapping service that converts one type of cryptocurrency for another. The ETH was converted to USDT and 412,010.3316 USDT was returned to 0x3963. Within thirty minutes of the final Uniswap transaction, 0x3963 used a bridge, Bridgers, to transfer 410,764.3 USDT to TSmwYxorcEo63Q5HhQB5233vEGP8S5vWer (TSmwYx) on the Tron blockchain in five transactions. Twenty-nine minutes later, TSmwYx transferred 410,649.733 USDT connected to Victim 1 to the Subject Address in four transactions.

43.    Prior to receiving Victim 1's 410,649.733 USDT, the Subject Address had a balance of 1,036,633.57 USDT. USSS later learned that most of this (1,036,194.2 USDT, or 99.9%) was connected to two additional victims of similar LEO Impersonation scams, Victims 2 and 3. Details of those Victims and the similar movement of their funds will be detailed below.

### *Back Tracing of Proceeds from Subject Address to Additional Coinbase Accounts*

44.    After tracing Victim 1's funds to the Subject Address, on February 21, 2025, USSS conducted a back-trace[4] to determine the origination of the other funds

---

[4] Back tracing is the process by which you trace back the flow of funds from a specific wallet address back to their point of origin to determine whether the funds originated from an

held in the Subject Address. This led to two additional Coinbase accounts that belonged to people other than Victim 1.

45. On February 25, 2025, law enforcement obtained records from Coinbase for the two additional accounts, including a Coinbase account ending in 4f24 and a Coinbase account ending in 81a9. This led to the identification of two additional victims.

### *Identification of Victim 2 – LEO Impersonator Scam*

46. Based on records provided by Coinbase, USSS was able to identify the account holder of Coinbase account ending in 4f24. On March 3, 2025, USSS interviewed the account holder, Victim 2. Victim 2, a resident of Bend, Oregon, confirmed they owned Coinbase account ending in 4f24 (Coinbase Account 4f24).

47. According to Victim 2, in late January 2025, Victim 2 received a similar phone call as Victim 1 from unknown individuals purporting to be with the USPIS, the FBI and the DOJ. As with Victim 1, Victim 2 explained that they were told they were the target of an organized crime and international money laundering case and had a federal warrant for their arrest. LEO impersonators convinced Victim 2 that they needed to submit their financial assets for a "forensic analysis" to rule out any connection to an organized crime and international money laundering investigation.

48. On January 31, 2025, at the direction of the LEO impersonators, Victim 2 created Coinbase Account 4f24. Victim 2 deposited $1,907,700 of their own funds

---

exchange where Know Your Customer records can be obtained.

into Coinbase Account 4f24. Like Victim 1, Victim 2 was coached by LEO impersonators on how to convert the $1,907,700 to ETH. Victim 2 did as directed and was left with 691.7939 ETH.[5] Victim 2 was then instructed by LEO impersonators to send the funds in ETH to various wallet addresses.

49.    Victim 2 believed their funds would be "forensically analyzed" and sent back after they were ruled out as a suspect connected to an organized crime and international money laundering investigation. After consulting with legitimate law enforcement officials, however, Victim 2 came to the realization that they were not a suspect in an organized crime and international money laundering investigation, nor was there a federal warrant for their arrest. At this point, Victim 2 realized they had been scammed.

### *Tracing of Victim 2's Funds to Subject Address (Exhibit B)*

50.    Victim 2's funds were traced using third party cryptocurrency and blockchain tracing analytical software. These findings were verified against open source blockchain explorers resulting in the same findings. From February 6, 2025, to February 9, 2025, 546.9068 ETH of the Victim 2's 691.7939 ETH moved through multiple addresses on the Ethereum and Tron blockchains, and were ultimately converted to USDT, before reaching the Subject Address.  A diagram illustrating the

---

[5] 691.7939 ETH at the time had a value of approximately $1,897,510. Approximately $10,190 in fees were paid to convert the funds to cryptocurrency.

movement of Victim 2's funds through the blockchain and into the Subject Address is attached as Exhibit B.[6]

51.     Specifically, between February 6, 2025, to February 8, 2025, Victim 2 transferred 546.9068 ETH from their Coinbase account to 0xfd8e34abc46f1e5d54082cb4620fb88fbd4a8659 (0xfd8e) on the Ethereum blockchain in four sequential transactions. Prior to these deposits, 0xfd8e was empty and had not conducted any transactions.

52.     Between February 6, 2025, to February 8, 2025, 0xfd8e then transferred the 546.9066 ETH to 0x5184113c7d280f423d461ca1b585ce08dd12ada2 (0x5184) in four transactions. Prior to these deposits, 0x5184 was empty.

53.     On February 9, 2025, 0x5184 transferred 205.0733 ETH to 0x4a31170eadad4550f569781030265b678a8f05eb (0x4a31).[7] Prior to this deposit, 0x4a31 was empty and had not conducted any transactions.

54.     Within twenty-two minutes of receiving these funds, 0x4a31 transferred 203.0653 ETH in seven transactions to Uniswap, a cryptocurrency swapping service that converts one type of cryptocurrency for another. The funds were converted and 538,839.4 USDT was transferred back to 0x4a31. Within twelve minutes of the final

---

[6] The remaining 144.8871 ETH of Victim 2's 691.7939 ETH followed a different path on the Ethereum blockchain and did not end up in the Subject Address. USSS has not identified the ultimate destination of that portion of Victim 2's funds.

[7] This left 0x5184 with a balance of 341.8337 ETH (all of which is attributed to Victim 2). On February 13, 2025, after the 205.0733 ETH was transferred out of 0x5184, Victim 2 sent an additional 84.4192 ETH to 0x5184, which brought the balance to 426.2529 ETH. Those funds later followed a different path and did not end up in the Subject Address. USSS has not identified the ultimate destination of that portion of Victim 2's funds.

Uniswap transaction, 0x4a31 used a bridge, Bridgers, to transfer 537,216.95 USDT to TNGgqGtJBMkRpMzQg6ByYV9YQxw3MfcYGG (TNGgqG) on the Tron blockchain in three transactions.  Fifteen minutes later, TNGgqG transferred 537,100 USDT containing Victim 2's funds to the Subject Address.

55.    Prior to receiving Victim 2's 537,100 USDT, the Subject Address had only conducted one transaction prior with a balance of 39.37 USDT from unknown origins.

### Identification of Victim 3 – LEO Impersonator Scam

56.    On March 12, 2025, USSS personnel interviewed the account holder of Coinbase account ending in 81a9, Victim 3. Victim 3, a resident of Sandy, Oregon, confirmed they owned Coinbase account ending in 81a9.

57.    According to Victim 3, in early December 2024, they received a similar phone call as Victims 1 and 2 – a call from unknown individuals purporting to be with the USPIS, the FBI and the DOJ. Victim 3 was also told they were the target of an organized crime and international money laundering investigation and had a federal warrant for their arrest. LEO impersonators also convinced Victim 3 to submit a list of financial assets for a "forensic analysis" to rule Victim 3 out as being connected to an organized crime and international money laundering investigation.

58.    On December 13, 2025, at the direction of the LEO impersonators, Victim 3 created Coinbase account ending in 81a9 (Coinbase account 81a9). Victim 3 deposited $5,583,800 of their own funds into Coinbase account 81a9. Like Victims 1 and 2, Victim 3 was then coached by the LEO impersonators on how to convert

the $5,583,800 to ETH. Victim 3 did as directed and was left with 1312.9030 ETH.[8]

Victim 3 was then instructed to send the funds in ETH to various wallet addresses.

59.     Similar to the other victims, Victim 3 believed their funds would be

"forensically analyzed" and sent back after they were ruled out as a suspect

connected to organized crime and international money laundering. After consulting

with legitimate law enforcement officials, however, Victim 3 came to the realization

that they were not a suspect in an organized crime and international money

laundering investigation, nor was there a federal warrant for their arrest. At this

moment, Victim 3 realized they had been scammed.

### *Tracing of Victim 3's Funds to Subject Address (Exhibit C)*

60.     Victim 3's funds were also traced using third party cryptocurrency and

blockchain training analytical software. The findings were verified against open

source blockchain explorers. From December 19, 2024, to February 11, 2025,

1,312.9024 ETH of Victim 3's 1,312.9030 ETH moved through multiple addresses

on the Ethereum and Tron blockchains, were converted to USDT, and then

transferred, in part, to the Subject Address. A diagram illustrating the movement of

Victim 3's funds through the blockchain and into the Subject Address is attached as

Exhibit C.

61.     Specifically, at the direction of the LEO impersonators, from December

19, 2024, to February 11, 2025, Victim 3 transferred 1,312.9024 ETH from their

---

[8] 1312.9030 ETH at the time had a value of approximately $4,317,511. Approximately
$1,266,289 in fees were paid to convert the funds to cryptocurrency.

Coinbase account to 0x8a92f67f94acf7617f0d65de1d0f9e73b55755c7 (0x8a92) on the Ethereum blockchain in three sequential transactions. 0x8a92 was empty prior to this deposit.

62.    Between December 19, 2024, and February 11, 2025, 0x8a92 then transferred 1,312.9016 ETH to 0x7da962095777b0e24d7c43fd5cf48452a43cc8d8 (0x7da9) in three transactions. 0x7da9 had conducted transactions prior to this deposit; however, it was empty at the time Victim 3's funds were deposited.

63.    On February 11, 2025, 0x7da9 transferred 186.1315 ETH to 0x84cd68775526593c10e0827170bbf2d081e4b18d (0x84cd). Prior to this deposit, 0x84cd was empty.[9]

64.    Within five minutes, 0x84cd transferred 185 ETH in six transactions to Uniswap. The ETH was converted and 502,929.926 USDT was sent back to 0x84cd. Within six minutes of the final Uniswap transaction, 0x84cd used a bridge, Bridgers, to transfer 501,415.136 USDT to TRZQPtFx74cjUhbz6dsvH7EN9fhHNQ2y71 (TRZQPt) on the Tron blockchain in three transactions. Eight minutes later, 499,094.2 USDT was sent from TRZQPt to the Subject Address.

65.    Prior to receiving Victim 3's 499,094.2 USDT, the Subject Address had a balance of 537,539.37 USDT, which includes the 537,100 USDT transfer connected to Victim 2.

---

[9] The remaining 1,126.7701 ETH of Victim 3's 1,312.9016 ETH moved along a different path on the Ethereum blockchain and did not end up in the Subject Address. USSS has not identified the ultimate destination of those funds.

D.    **The Subject Address**

66.    The Subject Address was first active on February 9, 2025. Between February 9, 2025, and February 14, 2025, the Subject Address had approximately eight incoming transactions, totaling approximately $1,447,365. Approximately $1,447,283.30 of these deposits (99.9%) were deposits connected to Victims 1, 2 and 3. A diagram re-illustrating the movement of all three Victims' funds through the blockchain and into the Subject Address is attached as Exhibit D. There were no outgoing transactions from the Subject Address which was likely a result of the internal freeze Tether placed on February 21, 2025. It appears that the Subject Address was primarily used to receive and conceal victim funds.

67.    As of March 19, 2026, the Subject Address had a balance of approximately 1,447,283.303 USDT.

68.    Based on the foregoing, including the volume of transactions, the transactions connected to Victims 1, 2, and 3, and the use of the address to receive almost exclusively victim funds, the Subject Address contained proceeds traceable to fraud and property involved transactions designed to conceal the true, nature, ownership, and control of fraud proceeds.

E.    **Seizure of the Defendant Funds**

69.    After this Court found probable cause that the funds constituted proceeds of a wire fraud scheme, in violation of 18 U.S.C. §§ 1343 and 1349, and property involved in money laundering offenses, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the USSS executed a Federal seizure warrant for all USDT

22

associated with the Subject Address. Upon execution of the seizure warrant, the USSS seized the Defendant Funds (approximately 1,447,284.30 USDT) associated with the Subject Address.

70.     As required by Supplemental Rule G(2)(F), the facts set forth herein support a reasonable believe that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Funds are derived from proceeds of wire fraud, and also constitute property involved in money laundering violations.

23

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff United States of America requests that this Court initiate a process of forfeiture against the Defendant Funds, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests the Court order the Defendant Funds forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: July 23, 2026                    Respectfully submitted,

                                        GREGORY W. KEHOE
                                        United States Attorney

By:    *s/Nicole M. Andrejko*
                                        NICOLE M. ANDREJKO
                                        Assistant United States Attorney
                                        Florida Bar No. 0820601
                                        400 West Washington Street, Suite 3100
                                        Orlando, Florida 32801
                                        Telephone: (407) 648-7560
                                        E-Mail: nicole.andrejko@usdoj.gov

and

                                        *s/Suzanne C. Nebesky*
                                        SUZANNE C. NEBESKY
                                        Assistant United States Attorney
                                        Fla. Bar No. 59377
                                        400 N. Tampa Street, Suite 3200
                                        Tampa, Florida 33602
                                        Telephone: (813) 274-6000
                                        E-mail: suzanne.nebesky@usdoj.gov

24

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Thomas Johnson III, declare under penalty of perjury that:

I am a Task Force Officer with the United States Secret Service. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 23 day of July, 2026.

*Thomas Johnson III*
Thomas Johnson III, Task Force Officer
United States Secret Service

25

**EXHIBIT A: Victim 1**



**EXHIBIT B: Victim 2.**



**EXHIBIT C: Victim 3.**



## EXIBIT D: Overall Victim Funds.

